Patrick M. HENDRICKSON, Plaintiff,

v.

GEORGIA POWER COMPANY,
Defendant.

No. 5:96–CV–500–3(DF).

United States District Court,
M.D. Georgia,
Macon Division.

Feb. 2, 2000.

Charles E. Cox, Jr., Macon, GA, Charles R. Adams, III, Macon, GA, for Patrick M. Hendrickson, plaintiff.

Howard Jerome Strickland, Howard Jerome Strickland, Jr., Macon, GA, for Georgia Power Co., defendant.

FITZPATRICK, Chief Judge.

Presently before the Court is Defendant's Motion for Summary Judgment in this wrongful death suit brought by Patrick Hendrickson, the father of Grant Hendrickson, deceased, against Defendant, the Georgia Power Company. The issues in this case arise from the murders of Grant Hendrickson and Michelle Cartagena on January 3, 1995. Andrew Cook was convicted of the murders and sentenced to death in the Superior Court of Monroe County in March, 1998. The murders took place at Defendant's camp site, Dames Ferry, near Lake Juliette. Plaintiff seeks to hold Defendant liable for Grant Hendrickson's death, claiming that the security inadequacies at this campsite led to this tragedy.

**I. _Factual Background_**

The facts leading up to this case are relatively undisputed. In the early morning hours of January 3, 1995, Grant Hendrickson and a female companion, Michelle Cartagena, were parked in a vehicle at the Dames Ferry Campsite. The campsite is a sixty-five acre tract of land owned by Georgia Power that fronts Lake Juliette.

The campsite was open to the public on a 24–hour basis, and it included a boat launching ramp, a parking lot, a small dock, concrete picnic tables, and public toilets. The public was permitted to use this facility without charge.

While at the campsite, Hendrickson parked his vehicle "on the point," an area at Dames Ferry very close to the water. Although the exact details are still unclear, it is undisputed that while parked in their vehicle, a man named Andrew Cook shot and killed both Hendrickson and Cartagena. Although Hendrickson's body was found in the vehicle, the partially nude body of Cartagena was dragged several feet away from the car. After a lengthy investigation of the crime, Mr. Cook was indicted and subsequently convicted of the murders. Although Mr. Cook's motive is still somewhat of a mystery, no one contends that this was any sort of property crime.

There were no security guards at the Dames Ferry campsite on the night in question. Defendant concedes that security personnel were only on site during the period from Memorial Day to Labor Day, the time in which the campsite received the most visitors, and even then, they were only hired for weekend duty. Most of the incidents which occurred on the site, some of which could be characterized as criminal, occurred during the time period described above. There were a number of alcohol-related incidents at the site, particularly fights, which occurred during the years preceding the murder of Mr. Hendrickson.

In light of these incidents, the Plaintiff contends that the Defendant shares responsibility for the murder of Grant Hendrickson. Its negligence in permitting an environment in which violent or potentially violent crimes frequently occurred, Plaintiff contends, was a contributing cause of Hendrickson's death. Defendant argues that because it allowed members of the public to use its land free of charge, it cannot be held liable for simple negligence

under Georgia's Recreational Property Act. Moreover, even if that act does not apply, the Defendant argues that it cannot be found liable here because the murders were not foreseeable as a matter of law. After a brief description of the standard of review to be applied in this context, the Court will address each of these contentions in turn.

## II. *Summary Judgment Standard*

In reviewing a motion for summary judgment, the court must view the record and all inferences therefrom in a light most favorable to the nonmoving party. *See WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988). Summary judgment may be granted where "there is no genuine issue as to any material fact." Fed.R.Civ. Proc. 56(c); *Lordmann Enterprises, Inc. v. Equicor, Inc.,* 32 F.3d 1529, 1532 (11th Cir.1994). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Williams v. Vitro Services Corp.,* 144 F.3d 1438, 1441 (11th Cir.1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Only when the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case" will the burden then shift to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir.1991) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). However, the mere presence of an alleged factual dispute between the parties does not make summary judgment improper; a genuine issue of *material* fact must exist for a court to deny summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## III. *Discussion*

### A. *Threshold Applicability of the Recreational Property Act.*

The State of Georgia enacted the Recreational Property Act (RPA), O.C.G.A. § 51–3–20 *et seq.,* in order to "encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes." O.C.G.A. § 51–3–20. To that end, landowners who allow their land to be used for recreational purposes are insulated from tort liability in certain instances. For example, a person using the land for recreational purposes will not be considered an invitee or licensee to whom a duty of care is owed. *See* O.C.G.A. § 51–3–24(2). Also, a landowner covered by the RPA generally has no duty to ensure that his premises are safe for those who use it. *See* O.C.G.A. § 51–3–22.

The RPA, however, applies only to landowners who allow persons to use their land for recreational purposes without charge. *See* O.C.G.A. § 51–3–23. A "charge" is defined as "the admission price or fee asked in return for invitation or permission to enter or go upon the land." O.C.G.A. § 51–3–21(1). The parties agree that Georgia Power did not require visitors to pay a fee in order to enter the Dames Ferry area. However, as Plaintiff correctly points out, the Georgia courts have denied defendants the shield of the RPA even where no fees have been charged under the so-called "business purpose" exception to RPA immunity. Plaintiff argues that the Dames Ferry campsite is operated for a "business purpose," and as a consequence of this fact, the Defendant cannot claim the protections of the RPA. In support of his position, Plaintiff cites the case of *Cedeno v. Lockwood, Inc.,* 250 Ga. 799, 301 S.E.2d 265 (Ga.1983). In that case, the owner a building adjoining an entertainment establishment, Under-

ground Atlanta, argued that it should receive the protections of the RPA because it provided recreational activities (in the form of entertainment facilities) to the public, free of charge. Although the court recognized that no charge was involved, it nonetheless declined to extend the protections of the RPA to the property owner in that case. The reason, the court noted, was that the defendant was in the *"business* of entertainment or recreation." *Id.* at 267 (Emphasis in original). The property owners in Underground Atlanta provided access in order to "attract the public to their businesses, not to give the public a place for recreation." *Id.* The Court explicitly stated that where "the public is invited to further the business interests of the owner—e.g., for sales of food, merchandise, services, etc.—then the RPA will not shield the owner from liability even though the public receives some recreation as a side benefit." *Id.*

Plaintiff seizes on this language and argues that Georgia Power is similarly prevented from invoking the protections of the RPA because its business interests are also furthered by the public's use of Dames Ferry. Specifically, Plaintiff notes that Defendant benefits from this use in two ways: (1) the Defendant passes on the costs of operating Dames Ferry when it charges its retail and wholesale utility customers, thereby recovering not only the costs associated with the project but also a small return; and (2) the Defendant is able to generate "good will" among customers as well as various other entities involved in the assessment of its rates. Neither argument is persuasive.

■ Plaintiff misapprehends the function of the "business purpose" exception to the RPA by focusing only on whether the Defendant made a profit on the land allegedly donated for public use. In *City of Tybee Island v. Godinho*, 270 Ga. 567, 511 S.E.2d 517 (Ga.1999), the court rejected such a broad view of the business purpose exception. There, the court held that a sidewalk owned and operated by a municipality fell within the auspices of the RPA.

Although the court acknowledged that there was evidence in the record from which an inference could be made that the city would receive some indirect financial benefit—in the form of sales tax revenues—from the public's ability to use and access businesses along the sidewalk, the court did not find this fact to be dispositive:

> The evidence in this case shows that a primary purpose of the sidewalk is to "give the public a place of recreation" by providing access to and viewing of a scenic site, and that the City is not in the business of entertainment or recreation and does not seek to make a profit from the use of the sidewalk.

*Id.* at 519 (quoting *Cedeno*, 301 S.E.2d at 267). The focus of the court, then, is not on whether an entity might profit from allowing free public access, but whether the primary purpose of allowing that access is to further the *direct* business interests of the owner.

Plaintiff, however, claims that *Godinho* supports its position because the court there noted that the city was not seeking to make a profit from the public's use of the sidewalk. In contrast, Plaintiff contends, the Defendant is seeking to profit here from the public's use of the Dames Ferry property. Essentially, Plaintiff's argument is that the Defendant is able to pass the costs of the Dames Ferry operation on to its customers, both retail and wholesale, and that in the process, Defendant obtains a profit on these recouped costs in the rates it charges those customers. Even assuming that is true, Plaintiff has failed to show that the Defendant is attempting to make that profit from those who use the campsite. And that is ultimately the question that the court must answer in the RPA context.

In *Godinho,* the court distinguished the *Cedeno* case by noting that the owner of the building there permitted public access in order to "further [its] *direct* business interests." *Id.* at 519 (Emphasis added). In other words, the owner allowed the

public to use its facility so that they would spend money at the facility, much like members of the public might do at a shopping mall. Because those using the facility would inevitably purchase food, drinks, and other merchandise, the cost of providing the "free" access could be passed on and recouped from those who benefitted from the landowner's apparent largess. In reality, then, the members of the public who used the facility were paying for their access. The same could not be said, however, for those who used the public sidewalk in *Godinho*. While there was some evidence that consumers used the sidewalk as a means of accessing various businesses (where they would presumably pay a sales tax), the evidence did not suggest that this was customary, much less the primary reason that members of the public used the facility. Thus, as a practical matter, the city in *Godinho* would not be able to recoup the costs of the public sidewalk from those who used it for recreational purposes. Consequently, the court in *Godinho* had no trouble in concluding that the city was protected by the RPA.

■ When one considers the purpose for which the RPA was designed, it becomes clear why the two situations described above should be treated differently. The RPA was enacted in order to encourage landowners to provide access to their land for public recreational use. *See* O.C.G.A. § 51–3–20. The quid pro quo for an owner's agreement to make land available at no charge is that he or she will then receive limited tort immunity for any injuries that occur on the property. *See*

*Edmondson v. Brooks County Bd. of Educ.*, 205 Ga.App. 662, 423 S.E.2d 413, 414 (Ga.Ct.App.1992). When a landowner charges those who use the land, however, either directly or indirectly, as in *Cedeno*, those who use the land are deprived of the benefit of the bargain struck for them by the state. Thus, limited immunity is not proper. In this case, on the other hand, the owner of the property, Georgia Power, has never charged those that use the property for recreational activities. Whether the Defendant has charged some third party, such as its retail customers, for the public's use of the Dames Ferry property is immaterial for purposes of the RPA.[1] That issue is one that is better addressed to the Georgia Public Service Commission or the Federal Energy Regulatory Commission, the entities responsible for approving Georgia Power's rates. The test in a case such as this is not whether the landowning-entity made a profit from the property; the test is whether that entity made a profit from those who used the property. And here, there is simply no evidence that Georgia Power received any money from those who used the Dames Ferry facility.

■ Plaintiff, however, argues that even if the Defendant did not receive any tangible benefits from the members of the public who used the park, it did receive intangible benefits in the form of "good will" that the Defendant could use to its advantage in seeking rate approvals from regulatory bodies.[2] As a natural monopoly, the Defendant does have to seek approval for

---

1. In the absence of a perfectly competitive market, it will almost never be the case that a business acts in a purely altruistic manner. A corporation, for instance, may decide to provide an endowment for a university; as a rational profit-maximizer, however, that same corporation will try to recoup the expense of its "gift" by passing the costs on to its consumers whenever possible. The reason why the donation is still characterized as a "gift," though, is because the entity receiving the money does not have to pay for it. Thus, a gift has occurred as between those two entities. The process of trying to track down when and if a business recoups its expenses

would be, the court suspects, an endless endeavor that would ultimately do little to further the goal of the RPA.

2. Plaintiff has also raised an equal protection argument in this case, contending that if the business purpose exception is not read to include benefits such as "goodwill" received, the statute would reflect an arbitrary classification in violation of the Equal Protection Clause. In light of the discussion *supra*, the Court finds no merit in the contention that such a classification would be constitutionally arbitrary.

its rates from government agencies. Consequently, it is possible that by allowing members of the public to use the Defendant's property without charge, some amount of good will is established that assists the Defendant in obtaining a favorable rate. The nature of this benefit, however, is so entirely speculative that the court has little trouble in concluding that it would not prevent the Defendant from invoking the protections of the RPA. On a more fundamental level, if the Court were to accept the Plaintiff's argument, a natural monopoly could *never* donate land for public use because the donation of the land would inevitably generate some good will among the beneficiaries. Construing the business purpose exception that broadly would effectively swallow the rule of limited immunity.

In sum, the Court finds that the Defendant is entitled to the protections afforded by the RPA. The next question is whether the Plaintiff can show that Defendant's conduct was willful or wanton, so that the general rule of limited immunity would not apply.

### B. *Exception for Willful Misconduct*

■ Despite the protections afforded by the RPA, nothing in that Act "limits in any way any liability which otherwise exists ... for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity...." O.C.G.A. § 51–3–25. Using Defendant's property, Plaintiff argues, is inherently dangerous in light of the high-level of criminal activity taking place at Dames Ferry. Plaintiff contends that Defendant's failure to address these problems constituted a "willful" failure to guard against a dangerous condition. The Georgia Court of Appeals uses a four-part test for determining whether a defendant has willfully failed to guard against a dangerous condition. The defendant must have actual knowledge: (1) that the property is being used for recreational purposes; (2) that a condition exists involving an unreasonable risk of death or serious bodily harm; (3) that the condition is not apparent to those using the property; and (4) that having this knowledge, the owner chooses not to guard or warn, in disregard of the possible consequences. *See Maleare v. Peachtree City Church of Christ, Inc.,* 213 Ga.App. 593, 445 S.E.2d 321, 323 (1994); *Georgia Marble Co. v. Warren,* 183 Ga.App. 866, 360 S.E.2d 286, 287 (1987). The undisputed facts show that the first element has been met.

■ The second element requires that the Defendant have actual notice of a condition involving an unreasonable risk of death or serious bodily harm. Plaintiff points to a number of arguably criminal incidents that occurred at Dames Ferry, evidence he argues should have been sufficient to put Defendant on notice that visitors to Dames Ferry faced an unreasonable risk of death or serious bodily harm. These incidents included discharge of firearms, abuse of alcohol, fighting, flashing, burglary, and other assorted rowdy conduct. Plaintiff also introduced several affidavits from witnesses who allegedly warned Defendant's agents about problems that might occur at Dames Ferry if the status quo continued. Specifically, Lisa Weldon testified that she warned security guards at Dames Ferry that someone would be injured if something were not done about the security problems at the campsite.

This evidence, even when viewed in a light most favorable to the Plaintiff, fails to raise a genuine issue of material fact regarding Defendant's knowledge of a dangerous condition at Dames Ferry. As a general proposition, a landowner need not guard against any dangers that might threaten the safety of those who use his land for recreational purposes. *See* O.C.G.A. § 51–3–22. By reducing the cost to landowners who make their land available for public use, the State hopes to encourage more landowners to make their land available. *See* O.C.G.A. § 51–3–20. However, when a landowner has knowledge of some specific danger on the property, the cost of taking action is quite low,

and the State therefore requires landowners to take affirmative steps to protect visitors in these instances. *See* O.C.G.A. § 51–3–25. For instance, if Defendant received an anonymous tip that a bomb would explode at Dames Ferry at a given date and time, then the Defendant's failure to close the park and notify visitors would surely be considered willful.

On the other hand, in a case such as the instant one, Defendant had no knowledge of any specific danger existing on the property. At best, Defendant had general knowledge that some crimes might occur in the future. The cases in which the courts have found a question of fact on the willfulness issue have all involved some sort of specific, static condition that a defendant could have easily rectified. *See e.g. North v. Toco Hills, Inc.*, 160 Ga.App. 116, 286 S.E.2d 346, 348 (1981) (hidden debris); *McGruder v. Georgia Power Co.*, 126 Ga.App. 562, 191 S.E.2d 305, 307, *rev'd on other grounds*, 229 Ga. 811, 194 S.E.2d 440 (1972) (drainage pipe). The condition that allegedly existed in this case, that future crimes of an unknown origin might occur on Defendant's property, is not something that Defendant could have easily addressed. Requiring landowners to take measures to guard against such an indeterminate threat would impose substantial costs on any landowner who allowed the public to use his land for recreational purposes. Such a reading of the statute would threaten its very purpose, which is to encourage landowners to make land available to the public for recreational use.

· Arguably, Defendant had notice of rowdy and boisterous conduct that occurred at Dames Ferry on a not too infrequent basis.[3] The statute, however, does not require Defendant to hire its own police force in order to prevent future problems from occurring. The RPA encourages landowners to make their land available to the public without·charge. The quid pro

quo for the owners of such land is that they need not take any affirmative steps to ensure the safety of those who use that land for recreational purposes. *See* O.C.G.A. § 51–3–22. That does not mean that a landowner may ignore existing hazards that it knows involve a likelihood of death or serious bodily injury. A history of rowdy conduct, however, does not put a landowner on notice of an existing danger. At best, the landowner is aware of problems that have occurred in the past and that might occur at some unknown time in the future. Short of locking the park, the only way a landowner could prevent such future harm from occurring would be to maintain a continuing security force. The RPA does not requires such measures. Consequently, the Court finds that the Defendant is entitled to the protections afforded by the RPA in this case.

### C. Foreseeability of Hendrickson's Murder

■ Summary judgment would be proper even if the RPA were not applicable in this case. In order to establish an ordinary cause of action for negligence, a plaintiff must show the familiar four elements: duty, breach, causation, and harm. *See Fallon v. Metropolitan Life Ins. Co.*, 238 Ga.App. 156, 518 S.E.2d 170, 171 (Ga. Ct.App.1999). Because the crime that occurred in this case was not foreseeable as a matter of law, the Plaintiff cannot show that the Defendant had a duty to use reasonable care in preventing Grant Hendrickson's death.

In reaching this conclusion, this Court is guided by a recent decision from the Northern District of Georgia, *Sumner v. Star Enterprise*, No. 1:97–CV–222–ODE (N.D.Ga. Apr. 5, 1999), *aff'd without opinion*, 204 F.3d 1123 (11th Cir.1999). There, the court was confronted with a situation in which a woman was kidnaped while using the car wash at a convenience store.

---

3. As noted previously, the vast majority of this conduct occurred during the period from Memorial Day to Labor Day.

The court noted that although a proprietor owes a general duty to "exercise ordinary care in keeping its premises and approaches safe," it does not owe a duty to protect patrons from third-party criminal attacks unless such acts are foreseeable. *Id.* at 9 (quoting *Walker v. St. Paul Apartments, Inc.*, 227 Ga.App. 298, 300, 489 S.E.2d 317 (1997)). In order for a question of fact to exist on the issue of foreseeability, the crime that serves as the basis of the lawsuit "must be substantially similar in type to the previous criminal activities occurring on or near the premises so that a reasonable person would take ordinary precautions to protect his or her customers or tenants against the risk posed by that type of activity." *Id.* at 9–10 (quoting *Sturbridge Partners v. Walker*, 267 Ga. 785, 482 S.E.2d 339, 341 (Ga. 1997)).

Despite the fact that four armed robberies had occurred at the convenience store in *Sumner*, the court held that, as a matter of law, the plaintiff's kidnaping was not foreseeable. In reaching this conclusion, the court followed the test articulated by the Georgia Supreme Court in *Sturbridge*. There, the court noted that in deciding whether previous criminal acts are "substantially similar," so as to put a property owner on notice of the need to take precautions, a court should:

> inquire into the location, nature and extent of prior criminal activities and their likeness, proximity or other relationship to the crime in question ... While the prior criminal activity must be substantially similar to the particular crime in question, that does not mean identical ... [What] is required is that the prior [incident] be sufficient to attract the [landlord's] attention to the dangerous condition which resulted in the litigated [incident].

*Sturbridge*, 482 S.E.2d at 341. Applying this test, Judge Evans found that the kidnaping was not foreseeable. With respect to the location of the previous crimes, the court recognized that the violent ones had all occurred inside the convenience store, and not at the car wash. *See Sumner*, No.

1:97–CV–222–ODE, slip op. at 17. The court also recognized that the nature of the previous crimes differed from the kidnaping in that the kidnaping was the first incident in which a customer (as opposed to a store employee) was threatened with violence from an unknown assailant. *Id.* at 18. Although recognizing the fact that property crimes could, in certain circumstances, give notice to a property owner of the need to take precautions against future acts of violence, the court did not believe that the plaintiff's kidnaping was foreseeable in this context. *Id.* at 19.

Applying the same principles, the Court reaches a similar conclusion with respect to the facts of this case. Other than citing a log of incident reports and conclusory testimony from police officials, Plaintiff has failed to set forth a specific number of incidents that occurred on the Defendant's property in the time leading up the Grant Hendrickson's murder. Defendant's objection to the introduction of the police log is well-taken. First, no foundation was laid for its authenticity. More importantly, however, the Plaintiff has failed to establish a foundation for the conclusions he seeks to draw from those reports. It is not at all clear that the incidents reported actually occurred on the Defendant's property, and the court has no way of knowing exactly what type of "incidents" occurred on the dates in question.

Even if the Court were to credit the Plaintiff's evidence, however, summary judgment would still be appropriate because the incidents disclosed, assuming they even occurred on the Defendant's property, fail to show that the Hendrickson's death was reasonably foreseeable according to the factors described in *Sturbridge*. As to the location of the alleged crimes, Plaintiff has failed to show that they occurred in the immediate vicinity of Mr. Hendrickson's murder. As the court implicitly recognized in *Sumner*, the fact that crimes occurred somewhere on the property is not enough; this is especially

true at a site as large as that owned by the Defendant.

Furthermore, the nature of the previous criminal activity was vastly different than the incident that occurred here. Most of the incidents reported involved domestic disputes or rowdy behavior by intoxicated visitors. About the closest thing that Plaintiff can point to for similarity is a report of a flasher seen shortly before Mr. Hendrickson's death. None of these incidents, however, were sufficient to put a reasonable person on notice that a violent crime such as the one that occurred here might take place if precautions were not taken. In *Sumner,* the court was unable to find that the crime committed was foreseeable because customers had never been randomly attacked. Likewise, there was no history at the campsite of members of the public being randomly attacked by unknown assailants.

The timing of the criminal activity here is also a strong consideration in support of the Defendant's position. Most of the incidents reported on the Defendant's property took place during the summer time, a period in which the property receives substantially more visitors than other times of the year. Thus, to the extent that these incidents demonstrated a need for added precautions, the Defendant could rightly argue that such precautions were only necessary from Memorial Day to Labor Day.

Plaintiff also relies on the precautions the Defendant did take in attempting to establish a question of fact on the foreseeability issue. Essentially, Plaintiff argues that Defendant should have foreseen that the security gates, warning signs, and lights it posted would give a false sense of security to those visiting the campsite, thereby permitting an environment where a violent crime such as the one that occurred here could take place. Of course, had the Defendant not taken these measures, Plaintiff would no doubt argue that it was negligent because it failed to take any measures against potential criminal activity. Undoubtedly, Plaintiff would argue that if the Defendant had only given an "illusion" of security, the criminal attacker might have been deterred. Under the circumstances, the Court does not believe that the measures taken by Georgia Power create an issue of fact with respect to the question of foreseeability.[4]

Plaintiff also attempts to rely on a statement from a Monroe County Sheriff's Deputy, Mike Strickland, who says that it was his "clear understanding" that the Defendant did not want its rules enforced for fear of retaliation against company property. There are two problems with his testimony. First, nowhere does the Plaintiff establish a foundation for this conclusory opinion. Although the statement of a party opponent, or one of its agents, is not hearsay, Plaintiff must establish a foundation for his characterization of those statements in order for the Court to consider such testimony. Second, and more importantly, this evidence still fails to establish the foreseeability of a crime such as the one that was committed here. To the extent that the Defendant's lax enforcement of its rules would be relevant, it would only be relevant to show the potential for future violations of a similar nature. To say, for instance, that the Defendant should have foreseen a homicide on its property because it did not enforce its alcohol rules with regularity strains credulity.

In short, the Plaintiff has failed to establish that the murder of Grant Hendrickson was a foreseeable crime that occurred, in part, due to the negligence of the Defendant. If the armed robbery of a convenience store on four separate occasions does not disclose the potential for a kidnaping, the court here has no trouble concluding that rowdy, boisterous conduct

---

4. Contrary to the Plaintiff's implicit suggestion, the case cited to support their position, *Walker v. St. Paul Apartments, Inc.,* 227 Ga. App. 298, 489 S.E.2d 317 (Ga.Ct.App.1997), does not state that such evidence is sufficient to establish an issue of fact on the question of foreseeability. Nowhere in the court's analysis of the evidence is this factor even mentioned.

such as that which occurred at Dames Ferry failed to disclose the reasonable possibility of a violent murder. Summary judgment is appropriate irrespective of the applicability of the RPA; however, the applicability of that statute makes summary judgment particularly appropriate.

That two young, much loved college students with such a bright future would be murdered in such a senseless, shocking and cold-blooded manner is so tragic that it is difficult to find words to express one's outrage or to offer sympathy to their parents. Since the invention of the automobile, young people in love have sought out romantic but isolated spots to park late at night. What this young man and young woman did on the night they died was so natural and normal that had they returned safely it would probably not even merited conversation with their friends. Of course, they did not return safely, having been slain by another very disturbed young man whose motives are unknown to this day. We all run the risk of random, senseless violence, often when we least expect it. The fact that this murder was so bizarre and apparently so random points out the inescapable conclusion: no fault or blame can be assigned to any person or company except the one who pulled the trigger and ended two promising young lives on that fateful night in January.

Accordingly, the Defendant's Motion for Summary Judgment is hereby **GRANTED.** Plaintiff's Motion for Summary Judgment is hereby **DENIED.**