CLARENCE COOPER, SENIOR UNITED STATES DISTRICT JUDGE
This premises liability and negligent security case is before the Court on Defendant's Motion for Protective Order [Doc. No. 79] and Defendant QuikTrip Corporation's Motion for Summary Judgment [Doc. No. 81]. For the reasons stated below, the Court GRANTS Defendant's Motion for Protective Order and GRANTS Defendant's Motion for Summary Judgment.
I. MOTION FOR PROTECTIVE ORDER[1]
This case arises out of an incident on December 29, 2016, during which Andrew Spencer was shot outside of the QuikTrip store located at 4050 Buford Highway, Atlanta, Georgia 30345. This Motion for Protective Order concerns Plaintiffs' Second Request for Production of Documents to Defendant QuikTrip. Among the requests are requests for documents and other materials concerning events and incidents at two other QuikTrip stores. Defendant QuikTrip ("Defendant" or "QuikTrip") objects to these requests, and the parties have not been able to resolve the dispute concerning these requests. Accordingly, Defendant moves the Court to enter a protective order with respect to the following three requests, which Defendant contends are over broad and seek information that is not relevant to any party's claim or defense:
• Request No. 1: The customer activity report for QuikTrip store located at 3292 Buford Highway, Brookhaven, GA between January 1, 2012 and December 29, 2016.
• Request No. 2: The customer activity report for the QuikTrip store located at 5500 Buford Highway, Doraville, GA between January 1, 2012 and December 29, 2016.
• Request No. 3: Any and all incident reports and documents relating to criminal incidents occurring at 3292 Buford Highway, Brookhaven, GA and 5500 Doraville, GA between January 1, 2012 and December 29, 2016.
*1183 A. Standard of Review
Federal Rule of Civil Procedure 26(b)(1) provides the following regarding the scope of discovery:
Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.
Fed. R. Civ. P. 26(b)(1). The term "relevant" is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 57 L.Ed. 2d 253 (1978) (citation omitted). Rule 26(b) permits the Court to relieve a party from the discovery requests if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).
A party from whom discovery is sought may move under Federal Rule of Civil Procedure 26(c) for a protective order limiting disclosure. Rule 26(c) authorizes the Court to issue a protective order to limit discovery and "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Moore v. Potter, 141 F. App'x 803, 807 (11th Cir. 2005) (internal marks and citation omitted). The movant has the burden of making a particularized showing of "good cause" for the issuance of a protective order. United States v. Garrett, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978) (citations omitted). In this context, "good cause" requires the moving party to make "a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." Id. (citations omitted). In other words, "the onus is on the party resisting discovery to demonstrate specifically how the request is unreasonable or otherwise overly burdensome." Reynolds v. General Motors Corp., No. 2:04-CV-0106-RWS, 2007 WL 2908564, at *2 (N.D. Ga. Sept. 28, 2007) (citation omitted).
B. Analysis
Good cause exists to grant Defendant's Motion for Protective Order. All of the discovery requests at issue are overbroad. They seek information regarding QuikTrip locations that are not relevant to any claims or defenses in this case, and they also are not properly limited with respect to content or time. Based on this Court's review of the law applicable to this case, the conditions, events, and incidents at these other two QuikTrip locations could not be used to show that Defendant had knowledge of a dangerous condition at the QuikTrip location that is the subject of this lawsuit. See McCoy v. Gay, 165 Ga. App. 590, 302 S.E.2d 130 (1983). Indeed, courts have held that criminal incidents taking place in different locations on a property were insufficient to put defendants on notice of a foreseeable risk of harm to customers by third parties at a different location on that same property. See, e.g., Heinzmann v. Simon Prop. Grp., LP, CIVIL ACTION NO. 1:08-cv-1847-ODE, 2009 WL 10668931, at *5 (N.D. Ga. Oct. 27, 2009) (holding that robbery that occurred in parking lot near one store at mall was not substantially similar to robbery that occurred in parking lot near another store nine months later at the *1184 same mall). Given that the information sought concerns completely different QuikTrip locations and for the many reasons set forth by Defendant as to how those QuikTrip locations differ from the location at issue in this lawsuit, the Court finds that the discovery sought is irrelevant and not discoverable under Rule 26. The requests are not narrowly tailored to seek information about "substantially similar" incidents as to place, time, or type of incident, and these simply is no justification for these overbroad requests. Accordingly, even if this case were allowed to proceed to trial, Defendant would be entitled to entry of a protective order.
II. MOTION FOR SUMMARY JUDGMENT
A. Background
1. Facts
As mentioned above, this is a premises liability case arising out of a criminal incident where a violent criminal gang member, Leroy Copney, shot Andrew Spencer in the parking lot of a QuikTrip at 4050 Buford Highway in Chamblee, Georgia, resulting in Andrew Spencer's death. (Defendant QuikTrip Corporation's Statement of Material Facts in Support of Its Motion for Summary Judgment "DSMF" [Doc. No. 81-2] ¶ 1; Plaintiffs' Statement of Material Facts "PSMF" [Doc. No. 90] ¶ 1.) The subject QuikTrip was in the area of multiple clubs. (PSMF ¶ 2.) It was an every-night thing for sometimes-intoxicated customers to come to QuikTrip after leaving Follies, one of the nearby clubs, between 3:00 am to 4:00 am. (Deposition of Rhamses Reyes "Reyes Dep." [Doc. No. 93] at 47: 16-24.) Gang members hang out at several clubs in the area, including at Follies. (Deposition of Alex Cushenan "Cushenan Dep." [Doc. No. 103-1] at 27:5-18.)
On Thursday, December 29, 2016, Spencer arrived at QuikTrip around 3:20 am, with his friend Quintin Heard, after leaving Follies. (DSMF ¶ 2; PSMF ¶¶ 1, 16.) Spencer was Defendant's invitee. (PSMF ¶ 17.) Spencer was on the premises for close to five minutes. (DSMF ¶ 3; Surv. Video POS 1&2 and Gas Left.) Spencer walked into the subject QuikTrip and to the hotdog stand where Copney was standing. (PSMF ¶ 18.) Spencer did not say anything to or touch the shooter. (PSMF ¶ 19.) Copney and Spencer were together in the store, near the hotdog grill, for less than a minute. (DSMF ¶ 3.) Surveillance video shows that Copney said something to Spencer before exiting the QuikTrip and then proceeded to his motor vehicle, placed a gun in his waistband, and openly paced in the parking lot near the front entrance of the store until Spencer exited. (PSMF ¶ 20.)
Copney shot Spencer after Spencer exited the store within a couple of minutes after the two had been standing together near the hotdog grill. (DSMF ¶ 4; Surv. Video Gas Left.) As Spencer and his friend exited the store, Copney stated, "what's popping," and then said "you guys were looking at me funny in the store. You know, y'all got any problems?" (PSMF ¶ 21.) He then said, "y'all out here fake reppin'." (Id. ) Heard understood these to be gang-related statements regarding gang affiliation. (Id. ¶ 22.) Neither Spencer nor Heard was in a gang nor did either represent the same. (Id. ¶ 23.) Heard described Copney's posture as a "fighting posture." (PSMF ¶ 24.) Heard indicated he was in a defensive stance himself because he assumed that the shooter was going to attack him, but then he relaxed when he saw a random Chamblee police officer pull into the parking lot as he assumed "that someone had called the police or they were just doing a regular routine in that area *1185 because of knowing what Follies is." (Id. ¶ 25.)
Chamblee officer Gaetano Antinozzi testified that at the time of the incident he went to the QuikTrip to get gas. (PSMF ¶ 27.) As he was pulling into the parking lot, Officer Antinozzi "pretty immediate[ly]" saw what appeared to be a "negative encounter, and I would say confrontation" between the shooter and Spencer. (PSMF ¶ 28; Deposition of Gaetono Antinozzi "Antinozzi Dep." [Doc. No. 103-2] at 46:4-47:1.) Heard testified that he did not think Copney knew that a police officer was in the parking lot. (Deposition of Quintin Heard "Heard Dep." at 57:17-21, 63:1-7.) The shooting occurred, and Spencer later died at the QuikTrip. (PSMF ¶ 29.)
QuikTrip employees were supposed to follow panic alarm guidelines pursuant to which employees were instructed to push an alarm upon seeing, among other things, a fight, suspicious loitering, a personal threat to a QuikTrip employee or customer, or larceny. (PSMF ¶ 30; Deposition of Charles Andrew Tennison "Tennison Dep." [Doc. No. 102] at 111:3-13.) Employees "pay attention to what is happening in the parking lot" and hit the alarm if they feel or think a situation is going to escalate. (PSMF ¶ 31; Deposition of Gregg Romero "Romero Dep." [Doc. No. 94] at 46:9-19.) Upon hitting the alarm, security contacts police and police can be at the QuikTrip within seconds. (PSMF ¶ 32; Romero Dep. at 46:17-19.) Belt alarms were an extension of the hardwired panic system. (Tennison Dep. at 34:8-11.) The belt alarms did not deter crime themselves, other than if a customer saw it and knew what it was. (Id. at 34:12-15.)
On the night of the incident, the on-duty manager, Rhamses Reyes, pressed his panic alarm after hearing gunshots. (PSMF ¶ 33; Reyes Dep. at 24:19-25:3.) Mr. Reyes testified that his "duties were just inside the store" and that he was not responsible for conducting any sort of patrol of the parking lot. (PSMF ¶ 42; Reyes Dep. at 75:18-21, 76:5-7.) Nothing was done to actually physically monitor the parking lot on the night of the subject incident. (PSMF ¶ 33; Reyes Dep. at 80:18-20.) Store manager Gregg Romero testified that Mr. Reyes paid attention to the situation and that Mr. Reyes was watching the guys through the window and could see the situation clearly. (Romero Dep. at 44:7-21.) Romero also indicated that if Mr. Reyes didn't pay attention to the situation, that would have been a mistake on his part. (PSMF ¶ 46; Romero Dep. at 44:12-15.)
Despite having outdoor cameras, the cameras at the QuikTrip were not constantly monitored and Mr. Reyes did not have the ability to view the cameras covering the parking lot areas. (PSMF ¶ 44; Reyes Dep. at 77:5-8, 103:17-19; Tennison Dep. at 37:1-3.) A group of people at the corporate security office in Tulsa, Oklahoma, would access and view video footage of the store if an employee hit the panic alarm. (PSMF ¶ 44; Romero Dep. at 18:12-23, 132:9-15.)
Defendant QuikTrip had in place a policy relating to security guards. (PSMF ¶ 34.) This policy indicated that "[i]t may become necessary to place a security guard in a store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent." (Id.; Pl.'s Ex. BB, Security Guards Policy.) Defendant relies on its store team, including the store manager and store supervisor, to request the addition of security guards if they feel a need for security in the store. (PSMF ¶ 35; Deposition of Marc Milburn "Milburn Dep." [Doc. No. 99] at 13:2-11.) Division Manager Marc Milburn has the ultimate approval for a security guard request in *1186 Atlanta. (Milburn Dep. at 17:20-22.) Mr. Milburn has placed security guards at stores based on his own determination that they were needed. (Id. at 18:15-19:10.)
Mr. Reyes testified that he had no training on security or security matters. (PSMF ¶ 36; Reyes Dep. at 41:9-12, 72:20-22.) It was his opinion that having a security guard may increase the likelihood of a crime occurring because the criminals get scared and may act more violently. (PSMF ¶ 37; Reyes Dep. at 72:8-15.) Mr. Reyes testified that he had no training on how to spot the need for increased or decreased security. (PSMF ¶ 37; Reyes Dep. at 72:23-73:1.) Mr. Milburn testified that there is no policy or procedure or any sort of training that would guide employees on how to exercise their discretion in requesting security changes "other than the security guard policy ... that suggests that if they have a situation where they would feel like there is a need for a security guard, to direct that information towards the store manager for the initiation of that conversation." (PSMF ¶ 36; Milburn Dep. at 27:18-25.)
Defendant QuikTrip's head of security, Mr. Tennison, testified that he has periodically throughout his seven-year tenure recommended that QuikTrip undertake a crime analysis for each existing store because he thinks "it would be a criteria that one would use to determine whether or not you would want to employ security or not...." (Tennison Dep. at 96:16-99:25, 101:21-25.) QuikTrip has not done an assessment of specific crime levels at each individual store because "[i]t's a significant amount of time to do that." (Id. at 102:6-8.) Mr. Tennison could not remember whether he had done an individual store level assessment for the subject store. (Id. at 22:15.) According to Plaintiffs' expert, failure to conduct such an assessment is a violation of industry standards and guidelines for assessing and mitigating risk of crime. (PSMF ¶ 39.)
Among other allegations, Plaintiff alleges in this lawsuit that if there was a security guard outside the QuikTrip store on weekday nights, specifically the Thursday morning when this incident occurred, this incident would not have happened. (DSMF ¶ 8.) The Wednesday night/Thursday morning of this incident there were three employees in the QuikTrip store. (Id. ¶ 9.) There was not a security guard at the store at that time. (Id. ¶ 10.) The store did have security guards on Friday night/Saturday mornings from 10:00 pm to 5:00 am and Saturday night/Sunday mornings from 10:30 pm to about 5:00 am or 5:30 am. (Id. ¶ 11; PSMF ¶ 12; 30(b)(6) Deposition of Kevin Thornton "30(b)(6) Thornton Dep." [Doc. No. 101] at 11:9-13:5.)
The role of security guards on the premises was to deter crime and step in if criminal activity occurred. (PSMF ¶ 48; Deposition of Alex Chang "Chang Dep." [Doc. No. 96] at 11:7-16, 12:15-20.) One of the security guards, Officer Chang, testified that he had intervened in a verbal altercation in the parking lot one time and that his intervention de-escalated the situation. (Chang Dep. at 13:15-14:5.) Officer Bothwell, another security guard, testified that if he saw a negative confrontation outside in the parking lot, he would observe it and then walk outside to see what he could hear. (Deposition of Chris Bothwell "Bothwell Dep." [Doc. No. 95] at 24:19-23.) If it was a negative confrontation, he would approach it cautiously and would observe and investigate. (Id. at 24:23-25:2.) He testified that he had done that on prior occasions and that de-escalated the situation. (Id. at 25:3-8.) He also testified, however, that if people were going to fight, "they was going to fight regardless." (Id. at 25:14-17.) He could not recall a specific incident where there was a *1187 physical fight out there because it's such a rare occurrence. (Id. at 25:19-26:8.) Officer Antinozzi testified that if a security guard had been present at time of the subject incident on December 29, 2016, the security guard would be obligated to intervene. (Antinozzi Dep. at 47:14-18.) He further testified that "if any alert police officer had seen what I seen - what I saw, they would have recognized it as a potential - as a negative confrontation that they should have least investigated." (Id. at 47:24-48:12.)
The following incidents occurred at the subject QuikTrip between August 4, 2012 and December 19, 2016. As is obvious, not all are "violent crime" incidents.
(1) December 19, 2016 (Monday) - sale of drugs in QuikTrip parking lot that did not involve any injury
(2) November 27, 2016 (Sunday) - verbal altercation in parking lot involving two people arguing over one vehicle blocking another
(3) October 24, 2016 (Monday) - altercation in the parking lot
(4) October 1, 2016 (Saturday) - woman held at gunpoint on QuikTrip's premises before being murdered
(5) March 20, 2016 (Sunday) - fight/altercation in the parking lot
(6) March 12, 2016 (Saturday) - shot fired in the QuikTrip parking lot
(7) December 13, 2015 (Sunday) - disorderly conduct in parking lot
(8) November 21, 2015 (Saturday) - male assaulted at QuikTrip
(9) June 11, 2015 (Thursday) - altercation in QuikTrip parking lot
(10) March 5, 2015 (Thursday) - assault and altercation in QuikTrip parking lot that involved two people arguing over a handicap parking space and a cup of water allegedly being thrown in one person's face
(11) January 7, 2015 (Wednesday) - break-in to motor vehicle at QuikTrip
(12) December 3, 2014 (Wednesday) - battery at QuikTrip that involved a domestic incident inside the store
(13) November 9, 2014 (Sunday) - assault rifles fired in QuikTrip parking lot
(14) October 9, 2014 (Thursday) - male with firearms at QuikTrip
(15) April 24, 2014 (Thursday) - criminal treaspass where person out of control and yelling at QuikTrip customers
(16) April 6, 2014 (Saturday) - shootout in QuikTrip parking lot where woman struck by bullet
(17) May 1, 2013 (Wednesday) - loitering for sex in QuikTrip parking lot
(18) August 4, 2012 (Saturday) - shots fired at QuikTrip parking lot
(PSMF ¶ 13; Pls.' Exs. H-V.)
There had been no prior violent crime incidents involving a gun outside the store, in the parking lot/gas pump area where the subject incident occurred, on weekday nights. (DSMF ¶ 12.) There had been only three weekend incidents at that store, outside in the parking lot/gas pump area, that Plaintiffs' expert points to as "violent crime" incidents.[2] (Pl.'s Rule 26 Expert *1188 Report [Doc. No. 56] at 10.) More detail regarding these three incidents is below.
First, on an early Sunday morning on April 6, 2014, there was a report of "shots fired" made at the QuikTrip. (DSMF ¶ 14.) QuikTrip was not aware of any injuries after reporting shots were fired in the parking lot. (Id. ¶ 15.) This incident occurred on a Sunday morning, and QuikTrip added an additional security guard for the Saturday evening/Sunday morning overnight shift, beginning the very next weekend, making security guards there on both weekend nights (Friday and Saturday). (Id. ¶ 16.) However, the additional security guard was added for the purpose of "crowd control" rather than employee and customer safety in response to the subject shooting. (Deposition of Kevin Thornton "Thornton Dep." [Doc. No. 100] at 33:11-18; 30(b)(6) Thornton Dep. at 38:4-7.)
Second, on an early Sunday morning on November 9, 2014, there was a report of "shots fired" where the police responding to the call stopped a vehicle and found an assault rifle. (DSMF ¶ 17.) A security guard was at the QuikTrip at this time and described this incident as "basically a shooting in the air." (Id. ¶ 18.)
Third, there was a Saturday night event on October 1, 2016, where a taxi driver held at gunpoint drove to the QuikTrip at gunpoint, was in the parking lot for a little over one minute (never leaving her vehicle), and then left, still at gunpoint. (Id. ¶ 19.) She did gesture and yell for help from inside her car, and a fellow cab driver followed her, calling 911 for help. (Id. ¶ 20.) The woman was found dead later that night. (Id. )
According to Defendant QuikTrip's expert, Glenn Harrison, there is a spike in crime in the area of the subject QuikTrip "between 3:00 am and 5:00 am, as bars and clubs empty out and alcohol takes effect." (Deposition of Glenn Harrison "Harrison Dep." at 34:10-13.) Mr. Harrison stated that "[t]he spike between 3:00 am and 5:00 am becomes more pronounced if one focuses on violent or gun-related crimes." (Id. at 34:14-18.) However, the observed spike is only on weekends. (Id. at 33:11-34:7.) Analyzing the data and analysis of Plaintiffs' expert, Mr. Harrison testified that Thursday was one of the top three or four most prevalent days for crime and that Thursday had the third highest rate of violent or gun-related crimes, but he qualified that statement by clarifying that it is not a big day at 3:00 am. (Id. at 49:67-17; 49:20-50:9.) Mr. Harrison did not specifically look at gun-related, outdoor crimes occurring on Thursdays, as the sample size would have been so small that one would not be able to describe the data reliably. (Id. at 68:10-69:14.) Nor did Mr. Harrison assess crime rates by month of the year. (Id. at 37:2-4.)
Plaintiffs' expert, John C. Villines, opines that in the immediate area of the subject QuikTrip, between January 1, 2015 and December 29, 2016, the highest incidence of reported criminal activity occurred between 3:00 am and 4:00 am. (Pl.'s Rule 26 Expert Report [Doc. No. 56] at 10.) Looking at the days of the week, Mr. Villines indicated that Thursday tied with Tuesday for having the second highest rate of incidents, and looking at months of the year, December had the third highest rate of incidents. (Id. )
2. Procedural History
On May 24, 2017, Plaintiffs Yvette Adelle Sanders, individually and as surviving parent, and Yvette Adelle Sanders, as Administratrix of the Estate of Andrew Thomas Spencer, deceased ("Plaintiffs"), *1189 filed suit against QuikTrip and BJS QT, LLC in the State Court of DeKalb County, Georgia. Plaintiffs allege several claims, including the following: (1) a premises liability claim under O.C.G.A. § 51-3-1 for a variety of alleged negligent acts (i.e., failure to keep the premises safe; failure to maintain, inspect, secure, patrol, and manage the premises; failure to warn of latent dangers on the premises; failure to maintain adequate patrols, security, policies, lighting, and security devices to permit proper use of the property; failure to remove loiterers; failure to inspect, patrol, monitor, and protect the parking lot and approaches to the gas station; failure to train and supervise employees in regard to the maintenance and safety of said premises; failure to properly retain, entrust, hire, train, and supervise employees; failure to ensure business policies, systems, and security were being adequately followed and implemented; failure to provide adequate lighting in the parking lot and employ other appropriate security measures; failure to remediate a very long history of crime at the subject property and others nearby in the area; failure to maintain a policy, procedure, or system of investigating, reporting, and warning of the dangerous condition of the subject property; failure to act on knowledge of prior crimes and the dangerous condition of the property; and failure to deter, correct, or warn of prior criminal activity, loitering, trespassing, and the dangerous condition of said property); (2) a claim for negligence per se; (3) a claim for punitive damages, and (4) a claim for attorneys' fees and expenses of litigation. The case was removed to this Court on June 22, 2017. BJS QT, LLC, the out-of-possession landlord of the subject premises, was dismissed from the case on October 24, 2017, based on a finding that there was no possibility Plaintiff could establish a cause of action against it. (See Doc. No. 46.) Quiktrip now moves for summary judgment, and that motion has been fully briefed and is ripe for the Court's consideration.
B. Standard of Review
Federal Rule of Civil Procedure 56 requires the entry of summary judgment when no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In seeking summary judgment, the moving party bears the initial responsibility to demonstrate that there is no genuine issue as to any material fact and that summary judgment is appropriate. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L.Ed. 2d 142 (1970) ; Allen v. Bd. of Public Educ., 495 F.3d 1306, 1313 (11th Cir. 2007). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).
When evaluating the merits of a motion for summary judgment, the court must view all evidence and factual inferences raised by the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts concerning the facts in favor of the non-moving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citation omitted). The court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).
A fact is material if proof of its existence or nonexistence would affect the outcome of the case under controlling substantive law.
*1190 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). Additionally, an issue of fact is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. An issue of fact is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or "not significantly probative." Id. at 249-250, 106 S. Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48, 106 S. Ct. 2505 (emphasis in original).
C. Analysis
Plaintiffs have brought this case claiming, among other things, that QuikTrip was negligent under O.C.G.A. § 51-3-1 in failing to exercise ordinary care to keep the premises safe. Plaintiffs allege that QuikTrip was negligent in numerous ways, as set forth above. Because of the intervening criminal act of Leroy Copney, QuikTrip maintains that it cannot be held liable for Mr. Spencer's tragic death. The Court agrees.
1. Negligence
To prevail on a cause of action for negligence under Georgia law, the plaintiff must establish the essential elements of duty, breach of duty, proximate causation and damages. Black v. Georgia S. & Fla. Ry. Co., 202 Ga. App. 805, 806, 415 S.E.2d 705 (1992). Under Georgia law, the owner or occupier of real property owes a duty to its invitees to exercise ordinary care in keeping its premises safe. O.C.G.A. § 51-3-1. Notwithstanding the foregoing, a property owner is not an insurer of the safety of entrants, and a mere showing that an injury occurred while on the premises of a proprietor is not sufficient, by itself, to create a presumption of negligence. Lee v. Food Lion, 243 Ga. App. 819, 820, 534 S.E.2d 507 (2000).
a. Absence of Duty to Protect Against Third-Party Criminal Acts
As a matter of law, a proprietor's duty of ordinary care toward its invitees does not normally include taking measures to protect them against the intervening criminal acts of third parties, as such acts usually are unforeseeable. See Doe v. Prudential-Bache/A.G. Spanos Realty Partners, L.P., 268 Ga. 604, 605, 492 S.E.2d 865 (1997) ; Sturbridge Partners, Ltd. v. Walker, 267 Ga. 785, 785, 482 S.E.2d 339 (1997). "If the proprietor has reason to anticipate a criminal act, he or she then has a duty to exercise ordinary care to guard against injury from dangerous characters." Wade v. Findlay Mgmt., Inc., 253 Ga. App. 688, 689, 560 S.E.2d 283 (2002) (internal marks and citations omitted).
In order to be reasonably foreseeable, the criminal incident causing the injury must be "substantially similar in type to the previous criminal activities occurring on or near the premises so that a reasonable person would take ordinary precautions to protect his or her customers against the risk posed by that type of activity." Drayton v. Kroger Co., 297 Ga. App. 484, 485, 677 S.E.2d 316 (2009) (internal marks and citation omitted); see also Agnes Scott Coll., Inc. v. Clark, 273 Ga. App. 619, 621, 616 S.E.2d 468 (2005). "Whether a 'substantial similarity' exists must be determined by the facts of each individual case. It is not required that the offenses be identical." MARTA v. Allen, 188 Ga. App. 902, 903, 374 S.E.2d 761 (1988). "[T]he court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in *1191 question." Sturbridge Partners, 267 Ga. at 787, 482 S.E.2d 339. The pattern of prior incidents must: "1) occur at comparable locations; 2) occur under similar physical circumstances and conditions; 3) be of a similar type; and 4) not be too remote in time." Gordon v. Starwood Hotels & Resorts Worldwide, Inc., 821 F. Supp. 2d 1308, 1313 (N.D. Ga. 2011). Absent such proof of substantially similar incidents, the exception to the general rule that proprietors are not liable for injury proximately caused by the criminal actions of third parties does not apply and the proprietor is not liable for injuries caused by the intervening criminal act. Doe, 268 Ga. at 606, 492 S.E.2d 865.
The shooting death of Andrew Spencer was not reasonably foreseeable, as prior crimes in the QuikTrip parking lot were not substantially similar and did not establish foreseeability. Plaintiffs rely on data regarding 18 crimes that occurred at the subject QuikTrip between August 4, 2012 and December 19, 2016. However, evidence of a "generalized risk of crime" is insufficient. The crimes must have been similar enough to make the killing of Mr. Spencer foreseeable. See Padgett v. Kmart Corp., CV 315-48, 2016 WL 6802482, at *9 (S.D. Ga. Nov. 15, 2016). Of the 18 incidents mentioned by Plaintiffs, only four were arguably substantially similar, insofar as they are properly characterized as "violent crime" incidents involving a gun outside the store. Of the four arguably substantially similar incidents, QuikTrip had knowledge of only three of these incidents. The fourth incident was reported to police, but Plaintiffs point to no evidence that QuikTrip knew about the incident. Notably, "there is no authority in this State imposing a duty upon a property owner to investigate police files to determine whether criminal activities have occurred on its premises." Wojcik v. Windmill Lake Apts., Inc., 284 Ga. App. 766, 645 S.E.2d 1 (2007) (quoting Sun Trust Banks v. Killebrew, 266 Ga. 109, 464 S.E.2d 207 (1995) ). Therefore, the Court focuses its analysis on the three incidents of which QuikTrip had knowledge.
Plaintiffs allege that if there had been a security guard outside the QuikTrip store on the Thursday in question, this incident would not have happened. However, none of the prior incidents involving gun violence would have drawn QuikTrip's attention to the need to have a security guard on the premises on weekday nights or on Thursdays, in particular. There had been no prior violent crime incidents involving a gun outside the store, in the parking lot/gas pump area where the incident in question occurred, on weekday nights. As to the three violent crime incidents involving a gun of which QuikTrip had knowledge that occurred on weekends outside of the store, two of them took place over two years prior to the killing of Mr. Spencer and thus were too remote in time to constitute "substantially similar" incidents that would make Mr. Spencer's killing reasonably foreseeable. See Padgett, 2016 WL 6802482, at *9 (holding that a criminal incident that occurred 18 months prior to the criminal incident that was the subject of the lawsuit was too remote in time to make the attack on the plaintiff reasonably foreseeable); Heinzmann v. Simon Prop. Grp., LP, CIVIL ACTION NO. 1:08-cv-1847-ODE, 2009 WL 10668931, at *5 (N.D. Ga. Oct. 27, 2009) (finding that a robbery that occurred outside of a mall nine months prior to a robbery that was the subject of the lawsuit did not create a genuine issue of material fact as to whether the later robbery was foreseeable because, in part, there was a "significant span of time" between the two robberies). The latter of those two incidents, which occurred on November 9, 2014, also was not "substantially similar" because it was *1192 "basically a shooting in the air" and actually occurred while a security guard was present. The third incident, which did happen closer in time to the incident involving Mr. Spencer, still was not "substantially similar" because the victim of that incident was not a QuikTrip customer but was a taxi driver who had driven to the QuikTrip at gunpoint and who was killed after leaving the QuikTrip. Therefore, in addition to these incidents having occurred on weekends, as opposed to weekday nights, there are independent reasons why the incidents cannot be considered "substantially similar." The Court agrees with QuikTrip that there were no prior incidents that were sufficient to put QuikTrip or any of its employees on notice of the allegedly dangerous condition of not having a security guard on weekday nights.[3] The incident involving Mr. Spencer was not foreseeable, and QuikTrip therefore had no duty to guard against injury that might be inflicted by third parties on weekday nights.[4]
b. Voluntary Undertaking
To the extent Plaintiffs argue that QuikTrip breached a duty because it voluntarily undertook security measures but did so in a negligent manner, that theory of liability also fails. "[I]f a proprietor voluntarily undertakes security measures for the benefit of its patrons, then-although the standard of care is not heightened and additional security measures are not necessarily required-the proprietor is required to perform the undertaking in a non-negligent manner." Anderson v. Radisson Hotel Corp., 834 F. Supp. 1364, 1371 (S.D. Ga. 1993) (citing Lau's Corp., Inc. v. Haskins, 261 Ga. 491, 405 S.E.2d 474 (1991) ). However, "an injured person seeking to impose liability upon another for the negligent performance of a voluntary undertaking must show either detrimental reliance [upon the undertaking] or an increased risk of harm [arising from the undertaking]...." Grandma's Biscuits, Inc. v. Baisden, 192 Ga. App. 816, 817, 386 S.E.2d 415 (1989).
Plaintiffs maintain that QuikTrip failed to follow internal policies and procedures that served, in part, to protect customers. For example, Plaintiffs point out that QuikTrip employees were supposed to follow a panic alarm system where they pushed an alarm upon observing a fight, someone loitering, a threat to a customer or employee, or larceny. Plaintiffs also emphasize that employees were supposed to watch the parking lot and engage this panic alarm system if they saw a fight or threat to a customer. Plaintiffs argue that the failure of any employee on the night in question to watch the parking lot, using cameras or otherwise, and to engage the panic alarm system before the shooting took place creates a genuine issue as to QuikTrip's negligence.
Here, even if the on-duty manager negligently failed to monitor the parking lot and to press the panic alarm upon observing *1193 a threat to a customer and/or even if QuikTrip was negligent with respect to the monitoring of the cameras, Plaintiffs point to no evidence that Mr. Spencer was even aware of the cameras or of Mr. Reyes's ability to press a panic alarm such that Mr. Spencer relied on those security undertakings while on the premises of QuikTrip. Moreover, Plaintiffs have not pointed to evidence that there was an increased risk of harm arising from the undertaking of security measures. Therefore, in addition to the Court's finding above that there was no initial duty that QuikTrip could have breached, the "mistake" by Mr. Reyes in not paying attention to the parking lot at the time of the incident in question and the inability of QuikTrip employees to view video footage onsite provide no basis to impose liability against QuikTrip.
c. Proximate Cause
Plaintiffs also are unable to point to a genuine issue of material fact regarding proximate cause, which consequently warrants the entry of summary judgment as to all claims of negligence alleged by Plaintiffs.[5] "Summary judgment is appropriate in negligence cases when, viewing all the facts and reasonable inferences from those facts in a light most favorable to the plaintiff, the evidence does not create a triable issue on the question of proximate cause." Reid v. Midwest Transp., 270 Ga. App. 557, 561, 607 S.E.2d 170 (2004) (citation omitted). "Although the question of proximate cause is ordinarily one for the jury to decide, plain and indisputable cases may be decided by the court as a matter of law. In such plain cases, the inquiry is whether the causal connection between the defendant's conduct and the injury is too remote for the law to countenance a recovery." Id. (citation omitted).
Here, Plaintiffs have not pointed to evidence that would convince a reasonable jury that the shooting death of Mr. Spencer might have been prevented if a security guard had been on duty, if Mr. Reyes had been paying attention to the parking lot and pressed the panic alarm as soon as the situation escalated, if the monitoring of the video footage had been different, and/or if QuikTrip had not otherwise breached any duty to Mr. Spencer, assuming, for the sake of argument, that such a duty existed and was breached. "Inherent in every case of liability for third-party criminal conduct is the existence of concurrent proximate cause of the [proprietor]'s prior negligent act or omission." FPI Atlanta, L.P. v. Seaton, 240 Ga. App. 880, 884, 524 S.E.2d 524 (1999) (citations omitted). "Generally, the independent, intervening criminal act of a third party, which directly caused the injury, will be treated as the supervening proximate cause of such injury, breaking the causal connection between the defendants' negligence and the injury, unless such intervening criminal act was a reasonably foreseeable consequence of defendants' negligent act or omission." Id. (citations omitted). "[I]f an injury would have occurred notwithstanding the alleged acts of negligence on the part of the defendant, there [can] be no recovery." Burnett v. Stagner Hotel Courts, Inc., 821 F. Supp. 678, 684 (N.D. Ga. 1993) (internal marks and citation omitted).
As an initial matter, the Court has already found that the incident in question was not reasonably foreseeable. The shooting *1194 death of Mr. Spencer was "sudden, unprovoked, and unexpected," as are many third-party criminal attacks. Watts v. Wayne Cty. Bd. of Educ., 201 Ga. App. 777, 778, 412 S.E.2d 541 (1991) ; McCoy, 165 Ga. App. at 593, 302 S.E.2d 130 ; Hewett v. First Nat'l Bank of Atlanta, 155 Ga. App. 773, 774, 272 S.E.2d 744 (1980). Considering how quickly the crime against Mr. Spencer occurred and that a police officer had actually pulled into the QuikTrip parking lot immediately before the shooting took place, Plaintiff provides no evidence that the presence of a security guard or other heightened security measures would have prevented the sudden shooting and killing of Mr. Spencer. See Palmeri v. Live Nation Utours (USA), Inc., No. CIVIL ACTION NO. 1:09-cv-01356-JOF, 2011 WL 13274223, at *7 (N.D. Ga. Mar. 8, 2011) (finding no evidence that additional security personnel would have changed the conduct of an intervening third party who ran towards the plaintiff and injured her within 60 seconds). Mr. Spencer was the victim of a "sudden and unprovoked criminal attack which the evidence shows was an independent, illegal act perpetrated unexpectedly and without warning by a third party," thus insulating Defendant from liability. Donaldson v. Olympic Health Spa, Inc., 175 Ga. App. 258, 261, 333 S.E.2d 98 (1985).
2. Negligence Per Se
Plaintiffs allege in their Complaint that Defendant was negligent per se. Plaintiffs appear to base this claim on an alleged violation of O.C.G.A. § 51-3-1. This statute cannot support a claim for negligence per se. Burns v. Colonial Stores, Inc., 90 Ga. App. 492, 494-95, 83 S.E.2d 259 (1954) ; Williamson v. Kidd, 65 Ga. App. 285, 15 S.E.2d 801 (1941). Therefore, Defendant is entitled to summary judgment on the negligence per se claim, too.
3. Punitive Damages
Plaintiffs seek punitive damages pursuant to O.C.G.A. § 51-12-5.1(b). Section 51-12-5.1(b) authorizes an award of punitive damages only in cases involving "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Punitive damages may only be awarded in a tort case where a valid actual damages claim exists. Nash v. Studdard, 294 Ga. App. 845, 851, 670 S.E.2d 508 (2008) (citation omitted). As such, QuikTrip is entitled to summary judgment on the punitive damages claim.
Alternatively, even if the Court allowed Plaintiffs' negligence claim to proceed, the Court still would grant summary judgment for QuikTrip on the issue of punitive damages. "Negligence, even gross negligence, is inadequate to support a punitive damage award." See Colonial Pipeline Co. v. Brown, 258 Ga. 115, 118, 365 S.E.2d 827 (1988) (citation omitted). Viewing the evidence in the light most favorable to Plaintiffs, there is an absence of evidence to show that Quiktrip's actions involved the kind of conduct that would warrant the imposition of punitive damages.[6]
4. Bad Faith Claim
Plaintiffs make the claim that Defendant acted in bad faith, was stubbornly litigious, and has caused Plaintiff undue expense *1195 under O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e). Insofar as Defendant is entitled to summary judgment on Plaintiffs' substantive claims, Defendant also is entitled to summary judgment on the bad faith claim under both statutes.
III. CONCLUSION
Based on the foregoing, the Court GRANTS Defendant's Motion for Protective Order and GRANTS Defendant's Motion for Summary Judgment.
SO ORDERED this 29th day of March, 2019.

Given the Court's decision on Defendant's Motion for Summary Judgment, Defendant's Motion for Protective Order arguably is moot. However, to the extent Plaintiffs might argue that the discovery requested would have created a genuine issue of material fact precluding summary judgment, the Court will proceed to analyze the merits of the Motion for Protective Order.

Plaintiffs mention two additional incidents that their expert did not point out in his report. One occurred over four years prior to the crime at issue in this case. The additional incident, which occurred on March 12, 2016, was a "shots fired" incident. There is no evidence that QuikTrip had knowledge of this incident. Even if QuikTrip did have knowledge of the incident, it simply involved a bystander who reported that a shot was fired into the air on a Saturday. There was no incident, altercation, or injury.

For this reason, it is immaterial that on-site employees allegedly were not trained on how to exercise their discretion in requesting security changes, such as a security guard, and that no one could affirmatively testify as to whether an assessment of crime in the area surrounding the subject QuikTrip had been done. Even a well-trained employee would not have been put on notice of the need to request a security guard on weekday nights, and a crime assessment also would not have revealed the need for a security guard around 3:00 am on a Thursday morning. As Defendant's expert testified, most of the crime on Thursdays occurred around 9:00 am, not in the middle of the night.

To the extent that the prior shooting incidents demonstrated a need for added precautions, QuikTrip reasonably argues that such precautions were necessary only on the weekends. See Hendrickson v. Georgia Power Co., 80 F. Supp. 2d 1374, 1382 (M.D. Ga. 2000).

Plaintiffs argue that Defendant did not move for summary judgment as to all of Plaintiffs' various negligence claims. However, Defendant did argue that there is no evidence of any breach of duty by QuikTrip and that "criminal actions are a proximate cause of the injury, superseding any negligence of a defendant...." (Doc. No. 81-1 at 6-7) (emphasis added).

QuikTrip's admission that it is responsible for the conduct of its employees in the course and scope of their employment and the absence of a valid claim for punitive damages is fatal to Plaintiffs' claim for negligent hiring, training, entrustment, supervision, and retention, and the Court does not address this claim further. See Durben v. Am. Materials, 232 Ga. App. 750, 503 S.E.2d 618 (1998).